## THATENHORST v. UNITED STATES.

### No. 2173.

Circuit Court of Appeals, Tenth Circuit.
March 31, 1941.

Lawrence E. Goldman, of Kansas City, Mo. (Richard H. Koenigsdorf, of Kansas City, Mo., on the brief) for appellant.

Keith L. Seegmiller, of Washington, D. C., Atty., Department of Justice (Summerfield S. Alexander, U. S. Atty., of Topeka, Kan., Julius C. Martin, Director Bureau of War Risk Litigation, and Fendall Marbury, Sp. Asst., Department of Justice, both of Washington, D. C., Charles L. Chalendar, of Kansas City, Mo., and Kenneth E. Spencer, of Washington, D. C., Attys., Department of Justice, on the brief), for appellee.

Before BRATTON and MURRAH, Circuit Judges, and KENNAMER, District Judge.

MURRAH, Circuit Judge.

The appellant enlisted in the United States Army on September 3, 1917. While in the service, he was granted $10,000 war risk insurance which lapsed for nonpayment of premium on October 2, 1919, unless the same matured by reason of the permanent and total disability of the appellant on or before the above-mentioned date.

The sole question presented by this appeal is whether the appellant became permanently and totally disabled on or before October 2, 1919.

Issues were joined and the case was tried to a jury. The jury disagreed. On the second trial, by agreement of the parties, the case was tried to the court without the intervention of a jury, upon the transcript of evidence produced at the former trial, subject to all previous objections and rulings then made and to such objections as might be made in the second trial, with such additional evidence as might be offered by either of the parties.

Upon submission of the case to the court as agreed, and after briefs were filed by the parties, the court found and concluded that the appellant did not become permanently and totally disabled within the meaning of the contract of insurance on or prior to October 2, 1919. Accordingly the court entered judgment against the appellant, from which he has appealed.

The appellant contends that the judgment of the trial court is erroneous because unsupported by any substantial competent testimony. He has assigned some seventy separate items of evidence, the admission, exclusion, or failure to rule upon of which he urges as reversible error.

From the whole record it is fairly clear that the appellant was at the time of the trial of the case totally and permanently disabled. He was unable to dress himself, feed himself, or care for his natural needs. His disability is caused by an organic disturbance of his neuro-muscular system, and this condition has progressed from its inception, either before or after his discharge from the Army, until he has reached a state of total disability.

It is incumbent upon the appellant to show a condition of total and permanent disability existing during the period of insurance protection. Eggen v. United States, 8 Cir., 58 F.2d 616; Wise v. United States, 5 Cir., 63 F.2d 307. It is not enough to establish that he was partially permanently disabled or temporarily totally disabled while the policy was in force. Hoskins v. United States, 5 Cir., 100 F.2d 343; Miller v. United States, 294 U.S. 435, 440, 55 S.Ct. 440, 442, 79 L.Ed. 977. The appellant cannot recover if total permanent disability occurred subsequent to the lapse of the policy on October 2, 1919, and this is true, even though it be shown that the total permanent disability was caused by conditions which arose or existed while the policy was in full force and effect. Hoskins v. United States, supra; United States v. Baker et al., 4 Cir., 73 F.2d 455.

Clearly if there is any substantial competent evidence to support the finding of the court, the judgment must stand. We are not warranted in overturning the judg-

ment of the court in these circumstances unless it is clearly erroneous. Rules of Civil Procedure, 52(a) 28 U.S.C.A. following section 723c. Gray v. United States, 8 Cir., 109 F.2d 728; United States v. Fitzpatrick, 10 Cir., 62 F.2d 562; Storey v. United States, 10 Cir., 60 F.2d 484; United States v. Peet, 10 Cir., 59 F.2d 728; United States v. Phillips, 8 Cir., 44 F.2d 689.

The appellant entered the military service as a "fine physical specimen, with muscles 'like a boxer'." Soon after entering the service, he was thrown from a caisson into a ditch, which resulted in hospitalization, applications of iodine, and hot applications of towels and packs to his legs, hands and back; apparently fully recovered; went to France; and was quarantined as a meningitis carrier, but did not contract meningitis.

While in the service, he complained of pain in his hands, legs and arms; of soft muscles and general weakness. He had some teeth extracted. Witnesses for the government testified that while in the service, the appellant took part in all types of athletics, and one of the witnesses particularly recalled having seen the appellant in France in July of 1918, when the appellant participated in a swimming meet. The records of the Adjutant General's office show no serious or disabling injuries, sickness or disease.

The appellant contends that he was given no physical examination prior to his discharge, but his commanding officer certified that he had no reason to believe that he had any disease or injury, and the examining surgeon certified that plaintiff was given a careful physical examination, and was found to be physically and mentally sound on July 30, 1919. Over the objections of the appellant, the examining surgeon, or the commanding officer in charge who had signed the appellant's discharge, was permitted to testify in reference to the general policy pursued with respect to examinations given soldiers under his command, at the time of discharge. He testified that the examinations were conducted by twenty-five or thirty doctors, including general practitioners and all types of specialists, and that it was the duty of the examining doctors to make notes of any disabilities found, including deformities caused by fracture or bullet wounds, hernia, or similar ailments, and that for final examination, the men were required to trot upstairs immediately after which their heart-beats were noted, and that if any difficulties were noted, they were sent to the review board for examination and diagnosis before discharge.

According to witnesses for the appellant, immediately upon his discharge and his return home, they observed that the appellant was stooped and drawn, walked with a dragging motion, had a downcast expression with a far-away look in his eyes.

Shortly after his discharge, the appellant returned to work for his pre-war employer, as a clerk in a grocery store. His employer testified that when he shook hands with him, his hand felt like a "cold, dead fish"; that he was stooped, walked with a shuffle, greeted the customers with a sour expression, and in filling orders, dropped cans and jars. After four or five weeks, he was discharged because he was unable to perform his duties.

From March 4, to May 15, 1920, he worked as a clerk in the stockroom for an electric light and power company. His salary was $100 per month. From May 15, to August 20, 1920, he worked for the same company as a pipe-fitter's helper at 58¢ per hour. The employment card contained a notation "Date of Examination, 3/4/20, Result OK." He was discharged because he was "physically incapable of satisfactorily performing his duties."

Immediately upon the discontinuance of his employment, and on August 20, 1920, he was hospitalized at a government hospital in St. Louis, Missouri. Contemporaneously he filed his claim for disability compensation with the government by reason of eye trouble, teeth and general weakness. He remained in the hospital until January of 1921, during which time he was diagnosed as a "neurasthenia; a constitutional neurotic." The examiners did not appear to be able to definitely determine the cause of his disability, and he was discharged as unimproved.

In April, 1921, he entered vocational training taking a course in mechanical drafting. He couldn't hold a pencil because of the cramping in his fingers. After two or three months he left without completing the course. He was then offered a general business course, where he remained for five or six months, attending school only about half the time, and did not finish the course. He was next offered and accepted a course in sign-painting (he remained there a couple of months) from which he secured a job with the Delmar

Sign Company. He remained with this company approximately one year, but states that he did not paint any signs or do any work.

While he was in vocational training, he applied for and was issued a $500 policy of life insurance by the Prudential Life Insurance Company. The policy did not require a physical examination. In 1923, he applied to the same company for an additional $1,000 policy. In this application, he listed his occupation as a sign-painter, and his employer as the Delmar Sign Company. He stated he was in good health and had received no medical treatment in the last three years, and had never had any serious illness or injury. He passed the required medical examination and the policy was issued. Again in 1924, in his application to reinstate one of the policies which had lapsed for nonpayment of premium, he stated that his health was good, and the soliciting agent represented that he appeared to be in good health.

On September 16, 1927, the plaintiff made application to the Prudential Life Insurance Company for total permanent disability benefits, in which application he stated that his present disability commenced in January, 1920, and that he had been continuously disabled from substantially engaging in any gainful occupation since May 15, 1925.

In 1924, a government facility diagnosed his handgrips as weak, "purely neurological in character." In that same year, another examination indicated the "general impression of a psychopathic inferior." His grip was weak, although his muscles seemed to have a "good tone and are not atrophic." In March of 1925, a government facility gave a tentative diagnosis of peripheral neuritis "with the knowledge that the condition does not correspond with the usual picture presented by this disease."

In May of 1925, according to government physicians, his condition was worse and there was a question as to the correctness of the diagnosis. It was undetermined whether he had a muscular atrophy or a peripheral neuritis. From that time there seems to be little question about the muscular atrophy, or of its organic origin. The records of the hospital facilities reflecting the chronological examinations and diagnosis clearly indicate that the appellant was suffering from a disease or infirmity which the doctors were unable to definitely diagnose.

Repeated examinations and observation by 1925 had definitely disclosed a progressive organic disease of the neuro-muscular system. The undisputed medical record, his unsatisfactory vocational training record, and his work record, coupled with his condition at the time of the trial; the testimony of his former employer and others who saw and observed him immediately after his discharge from the Army would, in our opinion, support a finding of total and permanent disability while the contract of insurance was in full force and effect. Indeed, the undisputed facts show that he was hospitalized after periods of unsatisfactory employment, and within one year after the policy lapsed for nonpayment of premiums. See Lumbra v. United States, 290 U.S. 551, 559, 560, 54 S.Ct. 272, 78 L.Ed. 492, and Berry v. United States, 61 S.Ct. 637, 85 L.Ed. ——, decided by the Supreme Court on March 3, 1941.

 This court, however, is not the trier of the facts. There is evidence undisputed in the record that the plaintiff represented himself to be in good health and following a gainful occupation during the time in which he now claims to be totally and permanently disabled. Medical experts testified that he could perform some types of clerical work in 1920. The disease or disability from which he is suffering is progressive in character. The exact date on which he became permanently and totally disabled is difficult of ascertainment, and must ultimately rest within the sound discretion of the trial court. The credibility of the witnesses who testified concerning his condition immediately after his discharge from the Army, which is the crucial period under consideration, was for the trier of the facts. We cannot substitute our judgment of the weight of the evidence or the credibility of the witnesses.

A jury disagreed on the weight of the evidence and the credibility of the witnesses, and the court exercising the functions of a jury, resolved the weight against the appellant.

 The appellant strenuously complains of the ruling of the trial court upon the admissibility of evidence. It would serve no useful purpose to separately treat each item of evidence which was offered by the appellant and excluded by the trial court, or those items of evidence offered by the government, objected to by the appellant, and admitted by the court, or those items

of evidence on which the court refused to rule concerning their admissibility. Suffice it to say that much of the testimony excluded by the court was based upon leading and suggestive questions which the appellant persistently propounded. Competent testimony can be elicited only by competent questions. No doubt much of the testimony sought to be introduced was competent, and should have been admitted in answer to a proper question. But it is not error for the court to sustain an objection to a question, the answer to which would be competent evidence, if the question is leading and suggestive, or calls for a conclusion of the witness.

The court failed to specifically rule on the admissibility of certain evidence proffered, but gave both parties an opportunity to urge the grounds of their objections in a brief, and because the court was trying this case on the submitted transcript of the testimony taken in a previous trial, it would appear to be only in the interest of time and without prejudice to the parties to consider for himself the whole record, and in such instance it will not be presumed that the court considered testimony which is not competent, or ignored any evidence properly before him. See Wall v. United States, 10 Cir., 97 F. 2d 672.

The admission of certain records of the War Department, pertaining to the health of the appellant at the time of his discharge from the service, and the general plan or routine followed in making examinations of veterans at the time of their discharge from the service, is clearly admissible. Indeed, much of this class of evidence in war risk cases is freely admitted in evidence, and used by the plaintiff as well as the defendant in establishing the medical history of the veteran. In the trial of cases to the court, without the intervention of the jury, much latitude is given to the admission of evidence, and unless it is clearly shown that the court excluded evidence which would ultimately affect, or which might cause the court to reach a different conclusion, the judgment of the trial court on the admission or exclusion of evidence should not be disturbed. Jennings v. United States, 5 Cir., 73 F.2d 470; Maryland Casualty Company v. Reid, 5 Cir., 76 F.2d 30. In the determination of the question of whether or not the trial court committed error in the admission or exclusion of evidence, appellate courts will look only to the question of whether or not there is manifest injustice. Jennings v. United States, supra; Wigmore on Evidence, 2d Ed., pp. 121, 122, 166, 167, 168; 5 Corpus Juris Secundum, Appeal and Error, § 1642.

It must be remembered that lawsuits are not tried by the square and compass, but by the innate sense of justice of the judge, whose duty it is to try the facts, and from those facts arrive at a just and impartial result.

From the whole facts, we are of the opinion that the judgment of the trial court is not clearly erroneous, because it is supported by substantial testimony admitted in the record, and that the ruling of the trial court on the admission or the exclusion of testimony offered and admitted could not affect the final result which the court reached as a trier of the facts.

The judgment of the trial court is affirmed.